**BARRETT CO. et al. v. PANTHER RUBBER MFG. CO.**

Circuit Court of Appeals, First Circuit. February 13, 1928.

No. 2167.

1. **Appeal and error** ⚖️185(1)—**Equity** ⚖️42(1)—**Lack of equity jurisdiction of federal court having jurisdiction of subject-matter held waived by failure to raise objection in trial court.**

The objection in a suit in equity in federal court that bill does not make case properly cognizable in court of equity does not go to court's jurisdiction as a federal court, and, where equity court had jurisdiction of the subject-matter, defendant, by failing seasonably to object to court's jurisdiction and approval of procedure in equity by adoption of equitable proceeding in their interrogatories and answer, waived any such objection, and could not raise it for first time on appeal.

2. **Principal and agent** ⚖️123(7)—**Evidence held to show that seller's agent had apparent authority to warrant fitness of product for buyer's disclosed purpose.**

Evidence *held* to show that seller's agent had apparent authority to make warranty of fitness of seller's product for disclosed purpose of being used in manufacture of rubber heels, and that no limitation on agent's apparent authority was brought to buyer's knowledge, and seller was therefore bound by his representations.

3. **Sales** ⚖️441(2, 3)—**Evidence held to show that buyer purchased relying on seller's skill and judgment, and that product manufactured out of material so purchased was unmerchantable.**

Evidence *held* to show that plaintiff manufacturer was induced to buy defendant's product for use in manufacture of rubber heels in reliance on representations of defendant's agent that it was fit for such use, and on defendant's skill and judgment, and that such product was not fit for the purpose for which purchased, and that its use rendered plaintiff's product manufactured therefrom unmerchantable.

4. **Evidence** ⚖️243(2)—**Statements by seller's agent as to knowledge of another's trouble with material sold held admissible to show falsity of declarations, before sale, as to successful use thereof by another.**

Statements by seller's agent as to his knowledge of trouble with the use of material sold, experienced by another company, made after discovery that buyer's use of seller's product in manufacturing rubber heels rendered such heels unmarketable, which statements tended to show that declarations made before the sale respecting successful use of the material by another manufacturer were made without disclosing his knowledge that its use had resulted in a green bloom, *held* properly admitted in evidence.

5. **Sales** ⚖️273(3)—**Seller of material to be used for disclosed purpose impliedly warranted that material was fit for such purpose (Uniform Sales Act Mass. [Gen. Laws, c. 106] § 17, cl. 1).**

Where buyer disclosed to seller the purpose for which oil was required to be used in manufacturing rubber heels, and relied on seller's judgment and skill to produce a merchantable article, free from latent defects, there was an implied warranty, under Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 1, that material purchased was reasonably fit for purposes for which they were sold.

6. **Sales** ⚖️32—**Seller's letter, stating quantity and price of goods sold, accepted by buyer, held to constitute complete contract.**

Seller's letter, stating seller's understanding that buyer agreed to take 900 to 1,200 barrels of its product at rate of 80 barrels per month, beginning on certain date at specified price, signed by seller and accepted by buyer, *held* to constitute complete contract, though it did not fix time of sale, nor deal in any way with question of warranty.

7. **Sales** ⚖️267—**Rule that written contract reciting particular warranty excludes others does not apply, where no warranty is mentioned.**

Where a written contract expresses a particular warranty, other warranties are exclud-

ed, notwithstanding Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 6; providing that an express warranty does not negative existence of implied warranty not inconsistent therewith, but rule does not apply where no warranty of any kind is inserted in the written contract.

**8. Sales ⬦440(2)—Statements of seller's agent tending to show warranty of fitness held admissible on issue whether purpose was disclosed and whether buyer relied on seller's skill and judgment.**

Statements of seller's agent, tending to show warranty of fitness of material purchased for disclosed purpose, *held* properly admitted in evidence to show whether buyer had made known to seller the purpose for which the goods were to be used, and whether buyer relied on seller's skill and judgment to produce merchantable article, free from latent defects which would render it unfit for the disclosed purpose.

**9. Evidence ⬦219(1)—Finding that seller's failure to make promised report of results of tests constituted admission that material purchased caused latent defects in buyer's product held warranted.**

Finding that seller's failure to make promised report to buyer as to results of tests of material sold in its research laboratory, and to answer buyer's letters concerning this investigation, amounted to an admission by conduct that it discovered that material sold caused latent defects in buyer's product, in manufacture of which material was used, *held* warranted.

**10. Sales ⬦273(5)—Statute declaring there is no implied warranty of fitness of articles sold under patent or trade-name applies only to goods known in market and among those familiar therewith (Uniform Sales Act Mass. [Gen. Laws, c. 106] § 17, cl. 4).**

Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 4, providing that there is no implied warranty as to fitness for any particular purpose of sale of specified article under patent or trade-name, is a substantial restatement of the common-law rule, and applies only to goods known in the market and among those familiar with that kind of trade by that description.

**11. Sales ⬦273(5)—Sale of material of variable chemical composition held not sale of specified article under its patent or trade-name, so as to exclude implied warranty of fitness; "sold under patent or trade-name" (Uniform Sales Act Mass. [Gen. Laws, c. 106] § 17, cl. 4).**

Sale of oily material, constituting residue *after distillation* of coal tar, and having a variable chemical composition, under name "B. R. V.," *held* not a sale of specified article under its patent or trade-name, within Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 4, providing that there is no implied warranty as to fitness of article "sold under patent or trade-name."

**12. Sales ⬦273(5)—Sale of article by trade-name or ordinary name does not exclude implied warranty of fitness for disclosed purpose (Uniform Sales Act Mass. [Gen. Laws, c. 106] § 17, cl. 4).**

That a sale is made of an article sometimes called by a trade-name or an ordinary name does not exclude an implied warranty of fitness

for a disclosed purpose, under Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 4.

**13. Sales ⬦270—Buyer's tests of material not revealing latent defects held not conclusive on buyer (Uniform Sales Act Mass. [Gen. Laws, c. 106] § 17, cl. 3).**

Notwithstanding Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 3, providing that, where buyer has examined goods, there is no implied warranty respecting defects which such examination ought to have revealed, buyer's tests of material made before purchasing for disclosed purpose *held* not conclusive on buyer, where evidence showed that nothing was revealed by the tests to indicate that after a lapse of time the goods manufactured from such material would develop defects making goods unmerchantable, and that defect was not discoverable by exercise of ordinary experiments.

**14. Damages ⬦6—Damages to good will need not be capable of calculation with mathematical accuracy to be recoverable.**

To be recoverable, damages to good will need not be capable of calculation with mathematical accuracy, but may be determined by approximation.

**15. Sales ⬦442(5)—Allowance of $20,000 damages to rubber heel manufacturer's good will resulting from using material purchased from defendant which caused manufacturer's product to be unmerchantable held proper.**

Where plaintiff rubber manufacturer, 98 per cent. of whose business was manufacturing rubber heels, and who had built up a large business and had a substantial degree of good will through years of competent manufacture and sale, as a result of defendant's action in selling it material used for putting out to the trade about three-quarters of a million dollars worth of heels, which, because of such material, proved unmerchantable, to the lasting detriment of reputation of plaintiff's product, *held*, that allowance of $20,000 damages for good will was not error.

**16. Sales ⬦442(6, 7)—Value of cartons destroyed on discontinuing brands of rubber heels manufactured because of trouble caused by seller's material used therein held properly allowed as damages.**

In suit for damages sustained by manufacturer of rubber heels from using material purchased from defendant, which rendered heels manufactured therewith unmerchantable, allowance as damages of value of cartons for brands of heels discontinued because of trouble caused by defendant's material, and which cartons were destroyed, *held* proper.

**17. Damages ⬦22—Damages accruing naturally from breach of contract are recoverable.**

One who fails to perform his contract is bound to make good all damages that result naturally from the breach, and the other party is entitled to be put in as good condition pecuniarily as he would have been by the performance of the contract.

**18. Damages ⬦67—Court has discretion to allow interest on unliquidated damages to arrive at fair compensation.**

Though interest is not usually allowed on unliquidated damages, in order to arrive at a fair compensation, in the exercise of its discre-

tion, court may include interest, or its equivalent, as an element of damages.

**19. Sales ☞442(10)—Buyer held entitled to interest on sum which would have been available to buyer, but for seller's breach of warranty of fitness (Uniform Sales Act Mass. [Gen. Laws, c. 106] § 17, cl. 1).**

Where evidence showed that plaintiff, manufacturer of rubber heels, would have had in its possession, available for use in its business, a specified sum in cash or goods, had it not been for defendant's breach of the warranty of fitness of material sold to plaintiff for use in manufacture of such heels, under Uniform Sales Act Mass. (Gen. Laws, c. 106) § 17, cl. 1, which rendered a large quantity thereof unmerchantable, and loss of which sum was a necessary consequence of such breach, *held*, that interest was properly allowed on such amount from the date of filing of the bill.

Appeal from the District Court of the United States for the District of Massachusetts; George W. Anderson, Judge.

Suit by the Panther Rubber Manufacturing Company against the Barrett Company of Maine and another. Decree for plaintiff, and defendants appeal. Affirmed.

Edward F. McClennen, of Boston, Mass. (Arthur E. Whittemore, of Boston, Mass., on the brief), for appellants.

La Rue Brown, of Boston, Mass. (A. C. Webber and Brown, Field & McCarthy, all of Boston, Mass., on the brief), for appellee.

Before BINGHAM, JOHNSON, and HALE, Circuit Judges.

HALE, Circuit Judge. This case comes before the court upon appeal from the decree of the District Court of Massachusetts giving judgment for the plaintiff, and ordering the defendants to pay to the plaintiff a total sum of $192,837.18, together with the plaintiff's costs of suit, as the same may be taxed by the clerk.

In its bill of complaint the plaintiff, a Massachusetts corporation, brings suit against the Barrett Company, a New Jersey corporation, and the Barrett Company, a Maine corporation, alleging as ground of jurisdiction that it is a suit in equity between citizens of different states, where the amount in controversy exceeds $3,000; further, that the Barrett Company of Maine had transferred all its assets in business to the Barrett Company of New Jersey; and that the suit seeks to reach and apply to the satisfaction and discharge of the cause of action assets of the Maine corporation in the hands of the New Jersey corporation.

In its bill the plaintiff tells this story, in substance:

That on or about the 27th day of December, 1919, the defendant, the Barrett Company (of Maine), through its agent, sold to the plaintiff a large quantity of a certain commodity called "B. R. V.," a substance manufactured by the defendant according to a process unknown to the plaintiff, and with a composition unknown to the plaintiff; the plaintiff for a long time had been engaged in the manufacture of rubber heels, which, as the defendant well knew, it was selling in large quantities throughout the United States; in such manufacture and sale it had acquired a valuable business good will, had spent large sums of money in advertising, and had established a valuable reputation for rubber heels under the brand and trade-name of "Panther"; the purchase of the said B. R. V. was induced by the solicitation of the defendant that the plaintiff substitute the B. R. V. for certain oil purchased from others than the defendant, which the plaintiff for a long time had been successfully using in the manufacture of rubber heels of good and merchantable quality; the plaintiff was manufacturing heels by a process which was fully disclosed to the defendant; and the defendant warranted that said B. R. V. was proper to be substituted for the oil used by plaintiff in the manufacture of rubber heels, and would, without any other change in the process employed by the plaintiff, result in the production of merchantable rubber heels of the kind and quality theretofore manufactured and sold by the plaintiff.

The defendant represented to the plaintiff that other persons had used B. R. V. in the manufacture of rubber heels by a process like that used by plaintiff, and that the rubber heels so produced were without any defect which would render them unmerchantable, or of less value than if manufactured with oil of the character which the plaintiff had been accustomed to use, and that this representation was known to the defendant, but not to the plaintiff, to be untrue; that the plaintiff relied upon the skill and judgment of the defendant and upon the representations made by it as to the fitness of B. R. V. for the manufacture of rubber heels by the process so designated; that, so relying, the plaintiff purchased of the defendant the B. R. V. and employed it in place of the oil which the plaintiff had theretofore employed in the manufacture of a large number of rubber heels of great value; that the defendant gave the plaintiff no advice or instruction with reference to the use of the B. R. V. which plaintiff did not follow; that the rubber heels, so manufactured by the use of the B. R. V., were in accordance with the

purposes disclosed, and that the rubber heels were sold and shipped to plaintiff's customers; but the heels were not good and merchantable heels of the kind theretofore manufactured and sold by plaintiff, but contained latent defects, not discoverable upon inspection in the ordinary course of manufacture and shipment to the trade; that these defects rendered the rubber heels wholly unmerchantable and valueless; and the plaintiff in consequence, and by reason of the defective quality of the heels, so manufactured with B. R. V., was damaged to the amount of $1,000,000.

The bill then makes a statement of the damages by items, and says that this damage directly and naturally resulted from the defendant's acts as stated. The bill alleged the transfer of the property of the Barrett Company of Maine to the Barrett Company of New Jersey, so that the property cannot be reached by execution and action of law, and that the plaintiff was not notified by the Barrett Company of New Jersey, prior to the sale and transfer, or given any information as to the proposed sale; that, therefore, the sale and transfer, the same being a sale in bulk of the stock of merchandise, otherwise than in the ordinary course of trade, was fraudulent and void as against the plaintiff.

[1] Upon the bill the defendants made a motion for further particulars and obtained same. They also propounded interrogatories and received their answers in due course. They answered the bill by raising the issues upon which the case was tried, and admitted the allegations in the portion of the bill entitled "Grounds of Jurisdiction." After all these pleadings, and after the case had been tried upon the issues raised in equity, the defendants, in their assignment of errors, now challenge the equity jurisdiction. They say that there was an adequate remedy at law, and that, as to the Barrett Company of New Jersey, the prerequisite of a bill in the federal courts is the obtaining of a judgment against the principal defendant and the exhaustion by the plaintiff of his legal remedies, citing Pierce v. United States, 255 U. S. 398, 41 S. Ct. 365, 65 L. Ed. 697. This objection does not go to the court's jurisdiction as a federal court. Pusey & Jones Co. v. Hanssen, 261 U. S. 491, 43 S. Ct. 454, 67 L. Ed. 763. The case does not present a cause of action where there is no actual equity jurisdiction. It is a case where equity, except for a technical objection, could apply and grant relief. If any objection had been made by the defendants, it could have been met by a transfer to the law side of the court. In such cases, where the defendant had consented to the action by the court, or has failed to object seasonably, to it, the objection will be treated as waived. Pusey & Jones Co. v. Hanssen, supra; Brown v. Lake Sup. Iron Co., 134 U. S. 530, 10 S. Ct. 604, 33 L. Ed. 1021. In the instant case it is evident from the bill, which we have stated in substance, that the plaintiff sought to recover unliquidated damages, caused by the failure of the material supplied to be fit for the intended use. The defendants were never left in doubt as to the plaintiff's case. They clearly showed their approval of the procedure in equity by their adoption of equitable proceedings in their interrogatories and in their answer. They showed by their conduct that they did not intend to make any objection to the adequacy of equity jurisdiction to deal with the questions involved. They did not specifically call the attention of the trial court to this point. The parties have been subjected to long delay and expense in protracted hearings, without objection by the defendants. We think it is now too late for them to raise such objection. If they wished to seek the transfer of the case from the equity to the law side of the court, they should have made their request at an earlier time; by not doing so they waived their right to raise the question. Their conduct indicates that they neither made, not intended to make, any objection to the jurisdiction of the court to deal with the question of warranty of fitness for a disclosed purpose, upon which the plaintiff relied. The relief sought was a remedy competent for equity to give. The courts have said that where a contention of this character is not raised at the trial and did not enter into the theory of the trial, it is too late to raise it in the court of ultimate resort. Hercules Powder Co. v. Rich (C. C. A.) 3 F. (2d) 12; Duignan v. United States, decided April 25, 1927, 274 U. S. 195, 47 S. Ct. 566, 71 L. Ed. 996; Blanchard Lumber Co. v. Maher, 250 Mass. 159, 163, 145 N. E. 62; Whiting v. Burkhardt, 178 Mass. 535, 60 N. E. 1, 52 L. R. A. 788, 86 Am. St. Rep. 503.

We think there is no merit in the defendant's assignment of an error by the District Court, in entering its decree in a case involving unliquidated damages shown in the record.

The plaintiff was a maker of rubber heels from a stock made of pure rubber, sulphur, and other chemicals, with a large mixture of "shoddy" or reclaimed scrap rubber, prepared for use by grinding and devulcanization; the proofs show that this process requires the use

of a stiffening material; that the plaintiff had been in the habit of using a mixture of liquid asphalt called "80–80," and a small amount of other oils, with the satisfactory result of a merchantable product; that the plaintiff sold its heels in large quantities all over the country, and its widely advertised brands and trade-marks became an asset of great value; closely connected with these brands and trade-marks were the molds which imprinted characteristic patterns upon the heels, and the cartons which bore a reproduction of those patterns, together with the trade-names or brands. The record makes it clear that the defendant—the Barrett Company of Maine—was a manufacturer of products obtained from the distillation of coal tar. In such distillation, after distilling out the products most valuable commercially, there is left a residue of a complicated and variable chemical composition—a waste product. This waste product was called "Barrett's Rubber Viva," or B. R. V.; it was not a definite or uniform material, but the residue after distillation, whatever such residue happened to be. An analysis of many barrels showed that the content of anthracine oil, which appears to have been the element causing trouble, varied in each barrel from 8 to 29 per cent.

The Uniform Sales Act (Gen. Laws Mass. c. 106, § 17), in its material parts, is as follows:

"(1) Where the buyer, expressly or by implication, makes known to the seller the particular purpose for which the goods are required, and it appears that the buyer relies on the seller's skill or judgment, whether he be the grower or manufacturer or not, there is an implied warranty that the goods shall be reasonably fit for such purpose.

"(2) Where the goods are bought by description from a seller who deals in goods of that description, whether he be the grower or manufacturer or not, there is an implied warranty that they shall be of merchantable quality.

"(3) If the buyer has examined the goods, there is no implied warranty as regards defects which such examination ought to have revealed.

"(4) In the case of a contract to sell or a sale of a specified article under its patent or other trade-name, there is no implied warranty as to its fitness for any particular purpose. * * *

"(6) An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

[2, 3] As early as 1918, and afterwards in 1919, the plaintiff was solicited by one A. B. Cowdery, who appeared to be an agent of the defendant, to substitute B. R. V. for the 80–80 which the plaintiff was using as the chief ingredient of its oil for stiffening scrap rubber. The plaintiff was entirely ignorant of B. R. V. By assignment of error the defendant challenges the admission of testimony relating to conversations between Cowdery and the plaintiff in these solicitations, and to subsequent conversations and a conference by telephone, on the ground that there is no evidence of authority on Cowdery's part to make a warranty or to bind the defendant by admission of defects in the B. R. V. The evidence shows that Cowdery, as the seller's agent, knew the conditions of manufacture in the plaintiff's factory and the manner in which it was proposed to use the material offered by the defendants; that he was taken through the factory, shown its machinery and its methods, and informed of the plaintiff's purpose in considering the purchase of the B. R. V. and the manner of its use, if the plaintiff should be persuaded by him to substitute it for 80–80; and that he told the purchasing agent that "the Barrett Company was a very large concern, that they stood behind every article that they manufactured or sold," and he gave the assurance, "Don't worry; you will never have any trouble with our oil, as it is a product of the Barrett Company."

The evidence clearly shows that the buyer —the plaintiff—made known to the seller the particular purpose for which the goods were required, namely, the use of the B. R. V. as an ingredient in the process of softening scrap rubber to produce rubber shoddy, to be used as a material from which rubber heels were to be compounded by processes which were standard and generally used in the industry. As a result of the solicitations, the plaintiff appears to have ordered and received certain B. R. V. for purposes of experimentation.

During the negotiations the following letters appear in evidence:

"Panther Rubber Mfg. Co., Sherbrook, Quebec, Can. Manufacturers of Sure Step Panther Tread Indian Surety, Yankee and Tri-Plug Rubber Heels, Soles, Soling, Mechanical and Moulded Goods, Gem Duck Soling.

"Stoughton, Mass. U. S. A.
"October 28, 1919.

"The Barrett Co., 35 Wendell St., Boston, Mass.—Gentlemen: We have received your invoice covering six 5-gal. cans of B. R.

V. delivered to our truck, and note that you have billed us at the rate of 60c. per gal. which is much higher than the price that we intended to pay.

"We are experimenting with this material, and if found satisfactory for our work, will use approximately one carload a month, but are unable to give this material a thorough tryout in small quantities.

"When our Mr. Long and Mr. Azulay talked with your representative' they spoke of a certain oil similar to what we have been using, and I would ask you to enter our order for a 25-bbl. lot of this material so that we may give it a thorough tryout, and trust that you will see your way clear to bill this material to us at the carload rate; also send us your credit to bring the price of the B. R. V. to the price as spoken when your representative was at this factory.

"Awaiting your further advices, and trusting that you are in a position to make immediate shipment of this 25-bbl. lot, beg to remain,

"Yours very truly,
"Panther Rubber Mfg. Co.,
"Wm. Bernstein, Treasurer."

"Mr. A. B. Cowdery, The Barrett Co., 35 Wendell St., Boston, Mass.—Dear Sir: With reference to our recent conversations covering B. R. V., beg to say that we are now in a position to. contract for this material at the price quoted us of 4c. per lb. delivered Stoughton, Mass., we to receive a rebate on all B. R. V. that we have received to date.

"If you will kindly write up a contract with a minimum of 1,200 bbls. and a maximum of 1,500 bbls. and forward same to this office properly signed, we will be more than pleased to countersign one copy and return it to you.

"Trusting that you will give this matter your prompt and careful attention, we are,
"Yours very truly,
"Panther Rubber Mfg. Co.,
"Frank Ward."

It appears from the proofs that in this last letter, as written, 1,200 was changed to 900, 1,500 to 1,200, and "80 bbls. per month" written in, and these changes were made as a result of talk over the telephone or by personal interview between the representatives of the parties. Then follows the next letter:·

"December 27, 1919.

"Panther Rubber Company, Stoughton, Mass., Attention Mr. Frank Ward—Dear Sirs: In confirmation of Mr. Cowdery's recent conversation with you and your letter of December 19th, we understand that you agree to take 900 to 1,200 barrels of B. R. V. at the rate of 80 barrels per month, beginning January 1, 1920.

"The price on this is 4c. per lb. freight allowed to Stoughton, Mass. As this is based on the present freight rate, it is agreed that if the freight rates increase during the term of this contract, an extra charge per ton will be made sufficient to cover this increase over the present freight rate.

"It is further agreed that you will receive a rebate on all B. R. V. that you have purchased to date to make the price of that B. R. V. the same as the price to you under this contract.

"If the above is in accordance with your agreement with us will you kindly sign one of these copies and return it to us?
"Very truly yours,
"The Barrett Company,
"By W. B. Alexander, Sales Manager.
"WBA:EDC
"Accepted:
"Panther Rubber Mfg. Co.
"Wm. Bernstein, Treasurer."

Following the solicitation and the letters, the plaintiff ordered a quantity of B. R. V. and used it in the production of a large quantity of heels. These heels, when finished and inspected, "looked all right." In the course of business the heels were placed in cartons, packed in cases, and sent to jobbers, and after a delay of months, when opened by the cobblers, the heels were found to have a green bloom upon them and to be unmerchantable. It is clear that the green bloom was a' latent defect in the B. R. V. The evidence makes it clear that Cowdery fully represented the defendant in soliciting the plaintiff to use B. R. V. in arranging the conditions and prices of the sales. The defendant's letter of December 27th accepted the arrangements made by Cowdery as to price and other items. We think it clear that Cowdery was informed in precise detail in reference to the purpose for which the goods were required, and that the buyer relied on the seller's skill and judgment. The changes made in the formula for compounding the heels are shown by the proofs to have been ordinary incidents in the industry, and had no connection with the processes in which the B. R. V. was used or with the results of the use.

The record leaves us in no doubt but that Cowdery had the authority to act fully for the defendant in the premises. He was the solicitor of the sales. He conducted all ne-

gotiations with the plaintiff. Evidently he was there for the purpose of obtaining all the facts in relation to the sales and the use for which B. R. V. was to be applied. He knew that the B. R. V., if used by the plaintiff, would be used in the preliminary process of softening scrap. He brought with him a piece of softened scrap, which he said had been produced by using B. R. V. He examined the process of softening the scrap. He was questioned as to the use of material for softening scrap, and his answers show familiarity with the subject and his knowledge of the methods of rubber heel manufacture. He saw 80–80 in use, and said that the B. R. V. could be used "the same as any other oil could be used—it could be used in direct work and mix it with crude rubber as a softener up to 4 per cent." It seems clear to us, then, that the buyer—the plaintiff—both expressly and by implication, made known to the seller of the B. R. V. the particular purpose for which the goods were required, and that the buyer relied on the seller's skill and judgment; that Cowdery dealt with the plaintiff under the obvious direction by the defendant to see whether a sale could be effected with the plaintiff, and afterwards with reference to the use of product and what it contained. He apparently represented the manufacturer in stating the contents of the material, and held the defendant out as competent to make an ingredient adapted for the purposes for which it was sold to the plaintiff.

[4] The defendant says there was error in the admission of Cowdery's statement as to his knowledge of trouble with the use of B. R. V. at the Hanover Rubber Company. It is urged that the admission of certain evidence of statements by Cowdery after the discovery of the trouble resulting to the plaintiff from its use of B. R. V. is an error. These statements tend to show that certain declarations made before the sale, as to the successful use of the material by a manufacturer of rubber heels, were made by Cowdery without disclosing his knowledge that its use had resulted in a green bloom. We are of the opinion that there was no error in the District Court in the admission of this testimony. Upon all the evidence, we find that Cowdery had apparent authority to make a warranty of fitness for the disclosed purpose for which the goods were required; that there was no limitation of his apparent powers brought to the knowledge of the plaintiffs. We think his apparent powers were his actual powers. Leavitt v. Fiberloid Co., 196 Mass. 440, 82 N. E. 682; Lalime & Part-

ridge, Inc., v. Hobbs, 255 Mass. 189, 151 N. E. 59; Danforth v. Chandler, 237 Mass. 518, 520, 522, 130 N. E. 105; Hall v. Bates, 216 Mass. 140, 103 N. E. 285.

We think the District Court made no error in admitting evidence of statements by Cowdery, either in person or by telephone, tending to show admissions of the defendant, nor admitting testimony relating to declarations of Cowdery as tending to show warranty.

[5] We are of the opinion that, under the Sales Act and upon all the proofs, there is imposed upon the transaction an implied warranty that the goods, namely, the B. R. V., sold by the defendant to the plaintiff, were reasonably fit for the purposes for which they were sold. The warranty imposed by the Sales Act results from evidence that the buyer made known to him—the seller—the particular purpose for which the goods were required, and that the buyer relied on the seller's skill and judgment to produce a merchantable article, free from latent defects which would render it unfit for the disclosed purpose.

[6] We think a completed contract resulted from the letter of December 27th, written by the defendant to the plaintiffs and accepted by the plaintiffs; for it seems clear to us that the minds of the parties met on the question of a purchase and sale. It is true that this contract did not contain such details as are often put into contracts. It did not fix the time of sale. It did not deal in any way with the question of warranty. The express provision of the Sales Act, in clause 6, is:

"An express warranty or condition does not negative a warranty or condition implied under this chapter unless inconsistent therewith."

[7] The Sales Act makes no distinction between contracts in writing and other contracts. It is true that, where a written contract expresses a particular warranty, it becomes plain that the minds of the parties have dealt with the general subject as to what warranties should be given, and by specifying one have excluded others; but the reason for the rule fails where no warranty of any kind is inserted in the written contract. Glackin v. Bennett, 226 Mass. 316, 115 N. E. 490; Grace & Co. v. National Wholesale, etc., Co., 251 Mass. 251, 146 N. E. 908; Whitmore v. South Boston Iron Co, 2 Allen, 52.

[8] The testimony received in evidence as to the statements of Cowdery upon the subject of warranty of fitness of the B. R. V. for a disclosed purpose was admitted, not to vary

any contract, but as bearing on the question whether the buyer made known to the seller the purpose for which the goods were sold, and whether the buyer relied on the seller's skill and judgment to produce a merchantable article, free from latent defects which would render it unfit for the disclosed purpose. The important question is whether such testimony was sufficient to allow the imposition of an implied warranty of fitness under the Sales Act. We think it admissible and clearly sufficient for such purpose. Ward v. Atlantic & Pacific Co., 231 Mass. 90, 120 N. E. 225, 5 A. L. R. 242; Grace & Co. v. National Wholesale Co., 251 Mass. 251, supra; Bird & Son, Inc., v. Guarantee Const. Co. (C. C. A.) 295 F. 451.

We are, then, constrained by the proofs to find that the Sales Act imposed a warranty of fitness of the B. R. V. for the purpose for which it was sold; that the buyer relied upon the seller's skill and judgment to produce a merchantable article, free from latent defects, which would render it unfit for the disclosed purpose; that the goods sold, namely, the B. R. V., was not fit for the purpose for which it was sold; that it had latent defects which could not be discovered, and were not discovered, until long afterwards, when. the goods came into the cobblers' hands. We are clearly of the opinion that the evidence shows a breach of the implied warranty imposed by the Sales Act. It is unnecessary, then, to consider further questions of express warranty found by the District Court. We think there is no merit in the assignments of error relating to the rulings of the District Court in regard to a warranty, nor in those relating to its rulings that there was a defect in the B. R. V.

[9] We think the District Court was right in finding that, if the plaintiff, before its purchase of the B. R. V., had been informed that the softened scrap made with B. R. V. showed a green bloom, it would not have bought and used the defendant's material in manufacturing its heels, and in the further finding of fact that the defendant's failure to make the promised report as to the results discovered in its research laboratory and to answer letters concerning this investigation amount to an admission by conduct that it discovered the B. R. V. to have been the cause of the development of the green bloom in the heels manufactured by the plaintiff, using this product which it had purchased from the defendant.

[10,11] We think it clear that there is no merit in the defendant's contention that this was a sale of a specified article under its patent or other trade-name. The provision in clause 4 of the Sales Act is a substantial restatement of the common-law rule that, where there is a sale of a known, described, and. defined article, and if that article is in fact supplied, there is no implied warranty of fitness for a particular purpose. We think the rule applies only to "goods known in the market and among those familiar with that kind of trade by that description." Inter-State Grocer Co. v. Bentley Co., 214 Mass. 227, 101 N. E. 147; Ireland v. Liggett Co., 243 Mass. 243, 247, 137 N. E. 371.

[12] The proofs indicate that B. R. V. was unknown to the trade; it was a "variable and indefinite oily mass." It was in evidence that 46 barrels contained 46 different percentages of anthracine oil and a great variety of other chemical substances. It is clear, too, that the fact that a sale is made of an article sometimes called by a trade-name or an ordinary name, does not exclude an implied warranty of fitness for a disclosed purpose. Leavitt v. Fiberloid Co., 196 Mass. 440, supra; Ireland v. Liggett, 243 Mass. 243, supra; Nashua River Paper Co. v. Lindsay, 242 Mass. 206, 136 N. E. 358; Kelly Asphalt Co. v. Barber Co., 136 App. Div. 22, 120 N. Y. S. 163; Carleton v. Lombard, 149 N. Y. 137, 43 N. E. 422.

[13] Clause 3 of the Sales Act provides that, if the buyer examined the goods, there is no implied warranty regarding the fitness which such examination ought to have revealed. It is urged that the plaintiff conducted tests of the material before buying it. These tests and their results were fully disclosed to Cowdery. After such disclosure the plaintiff was unwilling to rely upon the tests against the danger of possible defects in the material, and continued to demand Cowdery's warranty of the material. The tests bound the plaintiff only as to what was, or properly could have been, disclosed by reasonable testing. The testimony constrains us to find that there was nothing revealed by the tests or otherwise to indicate that after a lapse of time the goods sold would develop a bloom or other defect making the heels unmerchantable; that there was no defect discoverable by the exercise of ordinary experiments; that the defect was in fact not discovered until later by cobblers. Tests are not conclusive, one way or the other. In the case before us we find from the proofs that, after the tests, the buyer—the plaintiff—still had the right to rely upon the seller's judgment and skill, and in fact did so rely. Carle-

ton v. Lombard, etc., 149 N. Y. 137, 43 N. E. 422; Kellogg Bridge Co. v. Hamilton, 110 U. S. 108, 3 S. Ct. 537, 28 L. Ed. 86; Bierman v. City Mills Co., 151 N. Y. 482, 45 N. E. 856, 37 L. R. A. 799, 56 Am. St. Rep. 635.

[14, 15] The evidence clearly shows that the plaintiff suffered damages by reason of the defendant's fault. What were the damages?

The action of the District Court in allowing damage for the plaintiff's business good will is challenged by the defendants. The defendants say that there was reversible error in allowance by the court of damages for the plaintiff's business good will. The master had made no allowance for this; he said there was no such loss of a permanent nature, because by effort the plaintiff has retained the trade of certain customers, and had succeeded in developing new outlets for its goods. The District Court ordered the evidence on this point reported, and upon that evidence, and upon the findings of fact by the master, it added $20,000 to the plaintiff's award.

The record shows that in 1920 the plaintiff had a large business, and that this business was acquired by years of a competent course of manufacture and sale. In the fiscal year ending June 30, 1920, its net sales amounted to over $1,000,000. It had a steady growth from small beginnings. It had, from year to year, put its earnings back into the business, and it appears that the surplus of less than $400 on June 30, 1913, had expanded to over $275,000 on June 30, 1920. This business was 98 per cent. rubber heels. The testimony of competent witnesses shows that the reputation of its product was high with jobbing trade and that its heels were "easy to sell." It becomes evident that there was a substantial degree of good will. It appears that, as the result of defendant's action, the plaintiff put out to the trade about three-quarters of a million dollars' worth of heels which proved unmerchantable. These heels were largely scattered in the trade, to the lasting detriment of the reputation of plaintiff's product. It is not necessary that damages of this kind, in order to be recoverable, shall be capable of calculation with mathematical accuracy; these elements may be determined by approximation. Randall v. Peerless Motor Co., 212 Mass. 352, 379, 99 N. E. 221; Wells v. Nat. Life Ass'n (C. C. A.) 99 F. 222; Albiani v. Evening Traveler Co., 220 Mass. 20, 27, 107 N. E. 406. After a careful study of the proofs on this subject, we think there was no error in the allowance to the plaintiff of $20,000 for the loss of good will.

24 F.(2d)—22

[16] An assignment of error is directed to the allowance of $24,354.48 for cartons destroyed. The master had made an allowance of $5,000. The statement in regard to the net loss as to the sale of cartons is found in Exhibit 13–D. It appears that the B. R. V. did not enter into the manufacture of certain heels referred to as "Tri-Plug heels." The cartons were sold for junk; and it appears in evidence that the cartons would have been continued in use in the business, except for the change made because of the B. R. V. The evidence relating to this item came before the court upon the motion to recommit. Exhibit 13–D clearly refers only to cartons for brands of heels discontinued because of the trouble caused by the B. R. V. Exhibit 13–D, together with the testimony with regard to it, brings us to the conclusion that the District Court was right in increasing the master's allowance from $5,000 to $24,354.48.

[17-19] Error is assigned by the defendants, in that the District Court included in its decree a loss of interest from the date of the filing of the bill, June 15, 1922. The allowance of interest is held to be a matter of discretion. The testimony shows that the plaintiff would have had in its possession, available for use in its business, in cash or in its equivalent in goods, $154,341.47, had it not been for the fault of the defendants. We have found that the defendants made a breach of the warranty of fitness under the Sales Act; but for that breach, the plaintiff would have been entitled, as early as September 3, 1920, to that large sum. The loss of the use of this sum was a necessary consequence of the defendants' breach. The District Court found that interest is not generally allowed upon unliquidated damages. Mowry v. Whitney, 14 Wall. 620, 653, 20 L. Ed. 860; International Paper Co. v. Beacon Oil Co. (C. C. A.) 290 F. 45, 53. But it is clear that, in order to put the plaintiff in as good a position pecuniarily as it would have been, if it had not been led into using the defective material, it should have had the damages now assessed available in its business. Under the rule laid down in Miller v. Robertson, 266 U. S. 243, 45 S. Ct. 73, 69 L. Ed. 265, the District Court allowed interest as an element of damages from the date of the filing of the bill. The District Court found that this was the only way to give full compensation. In Miller v. Robertson the Supreme Court found that the elements necessary to a calculation of the amount the seller was then entitled to have to make it whole were known or ascertainable. In the instant case they were ascertainable after a long and expensive

trial. In the case at bar the damages were unliquidated, as in the Miller v. Robertson Case, until the trial. One who fails to perform his contract is bound to make good all damages that result naturally from the breach. The other party is entitled to be put in as good condition pecuniarily as he would have been by the performance of the contract. Curtis v. Innerarity, 6 How. 146, 154, 12 L. Ed. 380. Although interest is not usually allowed upon unliquidated damages, in order to arrive at a fair compensation, in the exercise of its discretion, a court may include interest or its equivalent as an element of damages. Bernhard v. Rochester German Ins. Co., 79 Conn. 388, 397, 65 A. 134, 8 Ann. Cas. 298; Frazer v. Bigelow Carpet Co., 141 Mass. 126, 4 N. E. 620; Faber v. New York, 222 N. Y. 255, 262, 118 N. E. 609; De La Rama v. De La Rama, 241 U. S. 154, 160, 36 S. Ct. 518, 60 L. Ed. 932.

Frazer v. Bigelow Carpet Co., 141 Mass. 126, 4 N. E. 620, was an action for the negligent destruction of property. The damages were wholly unliquidated. Mr. Justice Holmes discussed the general rule of law with respect to the allowance of interest for unliquidated damages. Referring to the long delay between the damage and the judgment, he said:

"But we have heard no reason suggested why, if a plaintiff has been prevented from having his damages ascertained, and, in that sense, has been kept out of the sum that would have made him whole at the time, so long that that sum is no longer an indemnity, the jury, in their discretion, and as incident to determining the amount of the original loss, may not consider the delay caused by the defendant. In our opinion they may do so; and, if they do, we do not see how they can do it more justly than by taking interest on the original damage as a measure."

A recent case is brought to our attention. General Motors Co. v. Shepard Co., 47 R. I. 153, 130 A. 593. This was a case of unliquidated damages; interest was not allowed in the trial court, but was added by the appellate court.

Upon the whole, we cannot see that the District Court erred in the use of its discretion in allowing interest.

No other alleged error is brought to our attention in the matter of damages.

We have passed upon all the questions raised in the assignments of error, although we have not attempted to follow the order of same, as summarized by the learned counsel for the defendants.

The decree of the District Court is affirmed, with costs to the appellee in this court.