## PATERSON PARCHMENT PAPER CO. et al. v. STORY PARCHMENT CO.

Circuit Court of Appeals, First Circuit. January 23, 1930.

No. 2372.

Anderson, Circuit Judge, dissenting.

Edward F. McClennen, of Boston, Mass. (Joseph M. Dohan, of Philadelphia, Pa., and Charles F. Dunbar, of Boston, Mass., on the brief), for appellants.

Sherman L. Whipple, of Boston, Mass. (Edward O. Proctor and Edward C. Park, both of Boston, Mass., on the brief), for appellee.

Before BINGHAM, ANDERSON, and WILSON, Circuit Judges.

WILSON, Circuit Judge. An action under section 7 of the Sherman Anti-Trust Act and section 4 of the Clayton Act (15 USCA § 15) to recover damages resulting from an alleged violation by the defendants of section 2 of the Sherman Anti-Trust Act. (15 USCA § 2), prohibiting the monopolizing of, or a combination or conspiracy to monopolize, any part of the trade or commerce between the several states.

At the close of the case, the defendants' counsel asked that the court instruct the jury to bring in a verdict for the defendants upon several grounds, among which are the following:

"The evidence is insufficient to establish that the plaintiff has suffered damage by reason of the acts of the defendants and West Carrollton Parchment Company in pursuance of the combination and conspiracy."

"The evidence is insufficient to establish that the plaintiff has lost profits because of any acts of the defendants and West Carrollton Parchment Company in combination and conspiracy."

"The plaintiff is not entitled to a verdict unless it has established that it has been damaged by the combination, contract or conspiracy."

"The plaintiff has not established that the reductions in prices by the defendants were any more injurious to the plaintiff by reason of any contract, combination or conspiracy than they would have been without such."

"The evidence does not warrant a finding that the plaintiff would have sold any more goods under other circumstances than it did sell."

"The evidence does not warrant a finding that the plaintiff would have sold at higher prices under any other circumstances than those at which it did sell."

"The plaintiff is not entitled to a verdict unless it has been shown that damages in some amounts susceptible of expression in figures, resulted from the defendants' acts and these damages must be proved by facts from which their existence is logically and legally inferable and they cannot be supplied by conjecture."

The record disclosed that prior to 1927 the two defendants, the Paterson Parchment Paper Company of Passaic, N. J., and the Kalamazoo Vegetable Parchment Company of Kalamazoo, Mich., both of which companies transact business in Massachusetts, and are hereinafter referred to as the defendants, together with the West Carrollton Parchment Company of West Carrollton, Ohio, which, for lack of jurisdiction, is not joined in this action, and which will hereinafter be referred to as the Carrollton Company, were the only producers in this country of what is known to the trade as parchment paper, which is used as a protective wrapper for meats, butter, and other foodstuffs.

It also appears from the record that these three companies for many years prior to 1927 maintained an association for the discussion of questions affecting their mutual interests, holding meetings every two months, at which representatives of such company with their counsel attended and discussed the condition of the trade.

There is no question but that, prior to the organization of the plaintiff company, the three companies above named had maintained a uniform price for their product, and, while there was some parchment paper imported, enjoyed a practical monopoly of the trade in this country.

All this the plaintiff or those who organized it knew when it entered the field. It does not appear that the condition of the trade and the demand for the product held out any special inducement to a competitor by reason of a prospective increase in the demand, at least over the capacity of the three old companies to supply.

The only hope the plaintiff could have had of acquiring any considerable share of the trade was by either producing a superior quality of paper, by more efficient salesmanship, or by reducing prices over those charged by the three companies already in the field.

While the plaintiff claims it did produce a superior grade of paper, and at a less

cost, through improved machinery, its first effort to obtain trade was to deal direct with the large packers and jobbers and offer a 5 per cent. discount on the prices then offered by the defendants and the Carrollton Company. Such a policy immediately resulted in a price-cutting war between the three old companies and the plaintiff. The defendants contend that to retain their trade they were forced to meet the prices of the plaintiff; that they had a right to do this to protect themselves; that they did not so act through a mutual understanding, or agreement; and that a reduction of prices does not result in a restraint of trade, but, on the contrary, encourages it.

The plaintiff concedes, as we understand it, that, if either or both of the defendants, independent of each other, had reduced their prices in order to retain their own trade as against the new competitor, it would have had no ground for action.

What it complains of is that the three old companies, by concerted action and mutual understanding, not only met its prices, but in some instances reduced their prices below those of the plaintiff, in order to prevent the plaintiff from acquiring any part of the trade in parchment paper and for the purpose of maintaining the monopoly which they already had, and which, if not an absolute monopoly, was sufficiently complete, so that, if they conspired together to maintain it, it constituted a violation of section 2 of the Sherman Anti-Trust Act (15 USCA § 2). Buckeye Powder Co. v. E. I. Dupont de Nemours Powder Co. (C. C. A.) 223 F. 881, 888, 889, affirmed in 248 U. S. 55, 64, 39 S. Ct. 38, 63 L. Ed. 123; United States v. E. C. Knight Co., 156 U. S. 16, 15 S. Ct. 249, 39 L. Ed. 325; Addyston Pipe & Steel Co. v. United States, 175 U. S. 211, 221, 237, 20 S. Ct. 96, 44 L. Ed. 136; Standard Oil Co. v. United States, 221 U. S. 1, 61, 31 S. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, Ann. Cas. 1912D, 734.

In other words, the plaintiff does not ground its action on a conspiracy to restrain trade under section 1 of the Sherman Anti-Trust Act (15 USCA § 1), though the indirect effect of a monopoly is to restrain trade, but on a conspiracy to maintain a monopoly under section 2 (15 USCA § 2).

On this issue alone, we think there was no error in the refusal of the court to instruct the jury to bring in a verdict for the defendants. Without expressing any opinion as to the soundness of the jury's conclusion, there was sufficient evidence to go to the jury on the issue of a concerted action by the three old companies to fix their prices so as to prevent the plaintiff from acquiring any part of their trade. Patterson v. United States (C. C. A.) 222 F. 599, 648, 649; Hitchman Coal & Coke Co. v. Mitchell, 245 U. S. 229, 249, 38 S. Ct. 65, 62 L. Ed. 260, L. R. A. 1918C, 497, Ann. Cas. 1918B, 461.

But, assuming that the jury was warranted in finding for the plaintiff on this issue, it does not necessarily follow that the plaintiff suffered injury. It must be proven. We think the weakness of the plaintiff's case, and wherein it failed on this branch of the case to establish the burden the law imposed upon it, is in a lack of proof that, by reason of the alleged unlawful acts of the defendants, it has suffered damage through what is termed "loss of profits," which can be measured and expressed in figures that are not based on speculation and conjecture, or that the damages resulting from the alleged depreciation of its plant in any measurable degree due to any unlawful acts of the defendants. Keogh v. C. & N. W. Ry. Co., 260 U. S. 156, 165, 43 S. Ct. 47, 67 L. Ed. 183; Jack v. Armour Co. (C. C. A.) 291 F. 741, 745. Upon the entire evidence, the jury should have been instructed to bring in a verdict for the defendants.

The use of the phrase "loss of profits" as the measure of one element of the plaintiff's damage is not a happy one. The plaintiff's declaration alleges, and its counsel in their brief contend, that the measure of damage on this phase of the case is not the loss of actual profits in its business, which it would have made if the defendants had not unlawfully combined to reduce prices, but the difference between the prices it was compelled to sell its products through the alleged unlawful combination, and the prices current in November, 1927, if fair and reasonable. It contends, as the plaintiff did in the case of Straus et al. v. Victor Talking Machine Co. (C. C. A.) 297 F. 791, that it is not obliged to sue for loss of profits in its business which are not always susceptible of proof. Loss of profits, to form the basis of damages, must be made reasonably certain by proof, or be inferable from proven facts that can form the basis for a rational estimate of their amount and not depend upon uncertainties and mere speculation or conjecture. Central Coal & Coke Co. v. Hartman (C. C. A.) 111 F. 96; McCornick v. U. S. Mining Co. (C. C. A.) 185 F. 748, 751; American Sea Green Slate Co. v. O'Halloran (C. C. A.) 229 F. 77, 80; Keogh v.

C. & N. W. Ry. Co., supra. Obviously in the case at bar there could be no evidence on which to base an estimate of any actual loss of profits during the period the plaintiff operated, based on previous experience, since the plaintiff never operated under what it claims are fair and reasonable prices for a sufficient length of time to furnish a standard, as the plaintiff had in Eastman Co. v. Southern Photo Co., 273 U. S. 359, 378, 379, 47 S. Ct. 400, 71 L. Ed. 684, and the jury were so instructed.

The plaintiff contends, however, that it is entitled, under the rule laid down in Straus et al. v. Victor Talking Machine Co., supra, and Thomsen v. Cayser, 243 U. S. 66, 88, 37 S. Ct. 353, 61 L. Ed. 597, Ann. Cas. 1917D, 322, to recover as damages, and regardless of whether it could prove any actual loss of profits in its business, the difference between the prices at which it was obliged to sell its products by reason of the alleged unlawful combination of the three old companies, and the prices current in November, 1927; and that the prices then current were fair and reasonable, at least, that it does not lie in the mouth of the defendants to contend otherwise, they having established them.

The error in the plaintiff's contention is the assumption that, but for the alleged unlawful conspiracy of the defendants with the Carrollton Company, the prices current in November, 1927, would have continued to prevail, assuming them to be fair and reasonable. The plaintiff by shifting its claim for damages from a loss of profits to the difference between the prices at which it would have sold its goods if no unlawful combination had existed, and the price at which it was compelled to sell its goods, cannot escape the rule that damages cannot be based on conjecture. While, if a wrong has been done, the law permits an award of damages, though not susceptible of accurate measurement, yet the rule still remains, and unimpaired, that they cannot be based on mere speculation. They must be made reasonably certain.

Individuals may in competition lawfully reduce prices below a fair and reasonable level. While the elimination of an unlawful combination may in a broad market reduce excessive prices to a reasonable level, it may not restore subnormal prices to a reasonable level, or keep them there. The artificial pressure removed, free competition between individuals to gain trade may always reduce or keep prices below what is fair and rea-

sonable. The plaintiff had no vested interest in the prices of November, 1927, or any right to complain if lawful competition reduced them below a fair and reasonable level.

There is, we think, this difference in applying the rule invoked by the plaintiff in the Victor Talking Machine Case and in the case at bar. In that case, the Victor Company, by agreement with others, designated as distributors, refused to supply machines to any dealer unless he first agreed to enter into a certain license agreement with the Victor Company, which the plaintiffs refused to do. As a result they were obliged to go out and pay excessive prices for Victor goods to supply the demand of their trade. Here the seller complains of prices unlawfully reduced. The jury in the Victor Talking Machine Case found that the plaintiffs otherwise could have bought in the open market the goods they sold during the period covered by the writ at the prices at which the Victor Company distributors sold to other dealers, and therefore the court held its damages were reasonably certain of computation. In the case at bar, the question of at what prices the plaintiff's product would have been sold, if there had been open competition, no unlawful combination, was not presented to the jury; on the contrary, the jury must have understood from the instructions given that, if they found that the November prices were fair and reasonable and would have been maintained but for the alleged unlawful acts of the defendants, the measure of damages would be $20,000, the difference between the November prices and the prices at which the goods were sold. In this respect we think the charge was defective and must have misled the jury as to the measure of damages on this phase of the case.

Obviously, without an agreement between the three old companies, there is no certainty that the prices of parchment paper in November, 1927, would have remained stable under the conditions the plaintiff would have had to meet. With only three competitors besides the plaintiff, and each free to fix any price it saw fit to retain its trade, and with a limited market, there is no ground on which it can be reasonably inferred that the plaintiff, during the few months it was able to continue in business, would have sold any definite amount of paper, or, if it did, that, following the initial concession by the plaintiff of 5 per cent. to the large buyers of parchment paper, the prices of November, or any prices above those actually received,

would have prevailed. On the contrary, it is, we think, a moral certainty that, according to nature's first law, each of the three old companies, if no combination had existed, in order to hold their trade, would at least have met every reduction in price made by the plaintiff to gain trade, if they did not openly reduce their prices below the prices fixed by the plaintiff, as independently they lawfully could do. That the defendants would, independently of each other, act upon this rule of self-preservation, is not mere conjecture, but a rule of action of which the courts often take cognizance.

Juries may, it is true, upon sufficient evidence, determine what fair and reasonable prices will be in open competition in a broad market; but the plaintiff, even if there had been no unlawful combination by the defendants, did not have a broad, open market in which to dispose of its product. Without any such unlawful interference, it would have been compelled to dispose of its product in the same restricted market which the old companies were already fully supplying, and to meet any prices the old companies individually saw fit to make. Nothing could be more certain than that each of the old companies would in any event use every lawful means to retain their own trade as against the new competitor; and nothing more conjectural than the result.

That, under such conditions, the November prices would have been maintained, and the plaintiff would have sold the same amount of its product at those prices, or that it would have sold any more goods than it did sell or at any higher prices, is pure speculation, with all the reasonable probabilities to the contrary.

As to the element of damages from the depreciation of its plant, it appears from the record that, when the plaintiff company organized, it had a paid-in capital of $204,000, and later obtained a credit at the local bank of $75,000, or, in other words, it had in available cash $279,000 to establish a business in a field which it knew was already pre-empted by well-established companies.

Its plant alone before its product could be put on the market cost $235,000, or approximately $30,000 more than its paid-in capital. It appears from the testimony of its treasurer that on June 1, 1928, two months before it was obliged to close down, it had not paid for its land, plant, and equipment by approximately $25,000; and two months later, after it had been in actual operation less than eight months, five of which it was running at about half capacity, it owed the local bank $70,000 and the company which supplied it with paper $65,000. Unless its stock on hand of about $8,000 and its bills receivable largely exceeded its bills payable, other than those above mentioned, which is not a reasonable inference from the testimony, its assets in eight months of operation had shrunk more than $100,000.

It is obvious that the plaintiff did not have sufficient capital to meet the situation it faced, even if there had been no conspiring together by its competitors and there had been open competition; and that its failure was inevitable either from lack of capital or inefficient management or both. Even $20,000 more in receipts, which is the plaintiff's own estimate of the maximum amount it would have received if the November prices had prevailed over what it did receive, could not have enabled it to meet its obligations and prevent the attachment and closing of its plant by its creditors; but the plaintiff has not shown that it actually suffered any loss of receipts from the sale of its goods, by reason of any unlawful interference by the defendants.

The plaintiff has not, therefore, sustained the burden of proving that it has suffered any measurable damage from the reduced prices at which it was compelled to sell its product by reason of the alleged unlawful conspiracy of the defendants, or that the subsequent depreciation of its plant was due in any measureable degree to any violation of section 2 of the Sherman Anti-Trust Act (15 USCA § 2) by the defendants. Buckeye Powder Co. v. E. I. Dupont de Nemours Powder Co., supra; Noyes v. Parsons (C. C. A.) 245 F. 689, 696; Locker v. American Tobacco Co. (C. C. A.) 218 F. 447; Jack v. Armour Co. (C. C. A.) 291 F. 741, 745.

Upon the first assignment of error, viz. that the judge below refused to direct a verdict for the defendants, the judgment of the District Court is vacated, and judgment is entered for the defendants, with costs in both courts.

The judgment of the District Court is vacated, and the case is remanded to that court, with directions to enter judgment for the defendants, with costs in both courts.

ANDERSON, Circuit Judge (dissenting). Clearly the majority opinion is correct in its holding that "there was sufficient evidence to go to the jury on the issue of a concerted action by the three old companies to fix their

prices so as to prevent the plaintiff from acquiring any part of their trade."

I think it equally clear that the opinion is wrong in holding the question of damages not also for the jury.

The evidence warranted the jury in finding that Levin, the chief factor in the plaintiff's enterprise, was experienced in that line of business; that he reasonably believed that he had equipped the plaintiff's plant with a more efficient parchmentizing machine, enabling it to produce the product more efficiently and cheaply; that the three old concerns had, since 1914, been relying mainly on their association and agreement to fix prices, and therefore had become unprogressive in equipping and operating their plants. Consequently, the evidence warranted the jury in finding that the plaintiff had reasonable expectations of successfully competing against the three old concerns by its new and more efficient plant and by better methods, both of producing and of marketing the parchmentized paper. The evidence also showed clearly that these concerns, as early as November, 1927, combined, by a price-cutting campaign, to kill the new competitor, and in seven or eight months succeeded. In a word, we have here, indisputably, a combination to kill a competitor followed by the speedy death of that competitor.

The majority opinion holds that this death was due to natural causes, and not to the illegal combination for price-cutting, carried on from November, 1927, through the succeeding winter and spring. This seems to me to be an utterly untenable position.

The trial court's instructions on damages were plain and correct, and disclose pretty fully the situation as to damages, as follows:

"The second proposition, or the second question in issue, is whether the acts of the defendants resulted in injury to the plaintiff. It is necessary, in a suit of this kind, for a party to go farther than the Government would have to go if it were proceeding under the antitrust law. The Government would prevail by showing only an unlawful combination; but an individual, when he seeks to invoke the statute in question, has to add one step more—he has to satisfy the jury that the losses which the plaintiff sustained were the direct result of the unlawful acts of the defendants. I take it that the unlawful acts, if they are found to be unlawful at all, were the acts of reducing prices. Nothing else seems to have been done that could work an injury, or that could possibly work an injury to the plaintiff. So that you

have to decide whether the plight in which the plaintiff company found itself at the time that it brought its suit was primarily and directly attributable to the price reduction. If you find that it was attributable to want of capital, to lack of experience, to inefficiency, or to the adoption of an unwise policy, and especially if you find that it adopted a policy of underselling old-established companies, why, then the defendants cannot be held responsible for that loss, because the loss cannot be attributed to the unlawful acts of the defendants.

"There is evidence here, of course, as to the situation in which the parchment paper industry was at the time when the plaintiff organized its corporation and undertook to enter into the trade. In a somewhat similar case to this, the court had occasion to charge a jury, and its charge has been held, I think, by the highest court in the land to have been proper, and I am going to paraphrase one paragraph of it, because I think that it is applicable to our situation."

"As to the profits on sales actually made, which Mr. Whipple has pointed out to you appear to have been around $20,000, assuming that it could have sold at the prices prevailing when the plaintiff entered the trade, namely, a basic price of 16 cents a pound for a 40-lb. paper, if you are satisfied that this price would have been maintained, would not have changed by reason of any economic condition, if it would have been maintained except for the unlawful acts of the defendants, if you find they did commit unlawful acts, and you satisfy yourselves from the evidence before you that the plaintiff would have sold $229,000—would have sold the same quantity of parchment—I will not give the figures—at the price of 16 cents, as a basic price of 16 cents a pound, during that period, or during *the* period, and that the plaintiff was compelled by the unlawful acts of the defendants to reduce its prices—if all of those conditions are found by you to have existed, then I think that you may consider as an element of damage the difference between the amount that the plaintiff actually received for the goods and what it would have received if the defendants had not indulged in the unlawful conspiracy to keep the plaintiff out of the field.

"The statute says that the plaintiff may recover for injury to business or property. What have you before you which will enable you to determine to what extent the value of the plaintiff's property has been diminished

by the unlawful acts of the defendants? Well, we have the cost of the plant. The plant is still there. The only evidence as to its present value is that of Mr. Goldmann, who is not an expert and who was an interested witness. We have no evidence from those who ought to know what the present value of that plant is, other than that of Mr. Goldmann. Now, I am not going to say to you that the difference between Mr. Goldmann's valuation and the cost is an accurate index of the loss, or the extent to which the value of the property has been diminished, but I am going to let you gentlemen decide whether it was diminished at all, and, if so, to what extent, if you are able to do it. If you are not able, on the evidence, to determine to what extent the value of the property was diminished, then the plaintiff has not sustained its full burden, because it is up to the plaintiff to satisfy you what the extent of that diminution was. If you think that Mr. Goldmann's testimony is to be relied upon in that respect—or I will not say that he gave any testimony that he did not himself believe in—but I mean to say, if you believe that that is to be taken as a good basis for your conclusion as to the extent of the diminution, why, the difference between the cost and the present value would be $160,000. Of these two elements, the loss of profits on the goods sold, if you find that all the conditions existed that I have enumerated, and that the plaintiff can recover, *that* loss would be $20,000, and whatever you may find, if anything, will fairly and reasonably represent the extent to which the value of the property is diminished. I think that it must be so that there has been a diminution; I think that it must be said that the property has diminished. It is worth less with the company out of business than it would be with the company in business. If upon the evidence you are able to say how much, that, of course, would be an element of damage. It is quite likely that the business, even though it had gone only six months or more, might have a potential value, but I have to say to you that there is no evidence here which affords a basis upon which you can determine what that potential value is. For that reason I think that the only thing that you can consider in estimating the damages to be awarded the plaintiff in this suit is the loss in profits on the goods actually sold, and the loss sustained in the damage to its property."

This shows that only two items of damage were claimed. The first, an item of $20,000, inaccurately but conveniently described as "profits," was in fact merely the difference between the price at which the plaintiff would have sold and the actual price received as the result of the price-cutting campaign put into operation by the defendants in November, 1927. The court on this item instructed the jury (not quoted above) that, in order to allow this item, "they must also find that that price of sixteen cents was a reasonable price." This presented a plain question of fact for the jury. It was for them to say, in the light of all the fully disclosed business conditions, what amount the plaintiff would have been able to sell, and whether it would have gotten this larger price, aggregating $20,000, except for the defendants' unlawful combination for price-cutting.

These damages were no more speculative in their nature than they are in every case of land taking, copyright, trade-mark, many patent cases, unfair competition, valuation for rate-making purposes, and personal injury. How is the question of whether a rate is confiscatory to be determined except by estimating future as well as past profits? What is a negligently lost arm or a leg worth, considering the uncertainty of human life, how long the victim might have used that useful member if he had not lost it by wrongful act? The ruling now made would make the assessment of damages impossible in a great majority of the cases in which only damages are a remedy for a wrong done.

But, apart from the minor item of diminished revenue (miscalled profits) in the record, the evidence showed beyond dispute that a plant costing about $235,000 had been put out of business; that of this $235,000 approximately $90,000 had been expended in equipping the plant with this special parchmentizing machine. There is absolutely no answer to the court's observation that there must have been damage when, as the result of the defendants' illegal acts, the plaintiff was compelled to close this plant down. The treasurer testified that he estimated the market value of the plant thus put out of business to be $75,000. The jury's verdict of only $65,000 indicated that it probably disregarded the $20,000 item, and cut very substantially the loss due to the closing down of this plant. But it is matter of common knowledge that the abandonment of such a plant thus equipped would do very substantial damage; the amount of that damage was plainly for the jury.

The statements in the majority opinion that the plaintiff went out of business for lack of sufficient capital, "and that its failure was inevitable, either from lack of capital or

inefficient management or both," amount to usurping the function of the jury. Indeed, the opinion on damages does not read at all like the opinion of an appellate court, dealing only with questions of law; it deals largely with facts solely for the jury.

There is no discussion of the soundness of the trial court's instructions on damages. By necessary implication, they are conceded to be correct. The conclusion is (to repeat) that, without the defendants' conspiracy to put the plaintiff out of business, it would have died anyway. The logic is, in that regard, hardly distinguishable from setting up the mortality of all human beings as a defense to an indictment for manslaughter or murder. The undeniable facts are that the defendants conspired to kill the plaintiff, and the plaintiff died. The majority opinion is to the effect that the conspiracy was unnecessary; that the plaintiff would have died anyway. I do not assent to such reasoning or to its results.

None of the cases cited supports the rulings made on damages. The main reliance seems to be on Keogh v. C. & N. Ry., 260 U. S. 156, 43 S. Ct. 47, 49, 67 L. Ed. 183. This was an action brought by Keogh as a shipper against eight railroads and twelve individuals, claiming, in substance, that he was entitled to the benefit of competition in railroad rate-making, although, after extensive hearings, in which Keogh participated, the rates of which he complained were approved by the Interstate Commerce Commission. The court held that, under these circumstances, he was not entitled to rates made in competition, saying:

"The instrument by which Keogh was alleged to have been damaged are rates approved by the Commission. * * * All the rates fixed were reasonable and nondiscriminatory. * * * What rates are legal is determined by the Act to Regulate Commerce [49 USCA § 1 et seq.]. * * * If the conspiracy here complained of had resulted in rates which the Commission found to be illegal because unreasonably high or discriminatory, the full amount of the damages sustained, whatever their nature, would have been recoverable in such proceedings."

It is true that the case dealt with the alleged damages as being purely speculative. But the reasons given make this ruling entirely inapplicable to the instant case, for the court said:

"Here the instrument by which the damage is alleged to have been inflicted is the legal rate, which, while in effect, had to be collected from all shippers. Exaction of this higher legal rate may not have injured Keogh at all; for a lower rate might not have benefited him. Every competitor was entitled to be put—and we must presume would have been put—on a parity with him. And for every article competing with excelsior and tow, like adjustment of the rate must have been made. Under these circumstances no court or jury could say that, if the rate had been lower, Keogh would have enjoyed the difference between the rates or that any other advantage would have accrued to him. The benefit might have gone to his customers, or conceivably, to the ultimate consumer."

This amounts to saying that Keogh (and all shippers) could not have damages assessed on an *il*legal or *non*legal theory of rate-making; that the law imposed parity of rates on *all* shippers; and that therefore damages alleged from a nonexistent, illegal theory of rate-making were purely speculative.

But that reasoning has no application to these defendants, who were separate, independent manufacturers, not required to make uniformity of prices, and not *permitted* to make such prices by concerted action, for the purpose of destroying a competitor. The doctrine of the Keogh Case has no bearing on the instant case.

In Straus v. Victor Talking Machine, 297 F. 791, 800, 802, and cases cited, the Court of Appeals for the Second Circuit laid down the general rule that:

"The constant tendency of the courts is to find some way in which damages can be awarded where a wrong has been done. Difficulty of ascertainment is no longer confused with right of recovery."

The same doctrine was stated by this court in Linen Thread Co. v. Shaw, 9 F.(2d) 17, 19, as follows:

"The rule that damages, if uncertain, cannot be recovered, applies to their nature, and not to their extent. If the damage is certain, the fact that its extent is uncertain does not prevent a recovery."

In spite of this firmly established rule, this court now holds this plaintiff, a victim of duly established wrongdoing, to be remediless.

See Hetzel v. Baltimore & Ohio R. R., 169 U. S. 26, 38, 18 S. Ct. 255, 42 L. Ed. 648, citing with approval applicable language from Baker v. Drake, 53 N. Y. 211, 220, 13 Am. Rep. 507. See, also, Hamilton-Brown Shoe Co. v. Wolf, 240 U. S. 251, 259, et seq., 36 S.

Ct. 269, 60 L. Ed. 629, a trade-mark case; Randall v. Peerless Motor Co., 212 Mass. 352, 379, et seq., 99 N. E. 221, and cases cited; Barrett v. Panther Rubber Co. (C. C. A.) 24 F.(2d) 329, 337; Gagnon v. Sperry & Hutchinson Co., 206 Mass. 547, 555, 92 N. E. 761; Hetherington & Sons v. Firth Co., 210 Mass. 8, 21, 95 N. E. 961.

The overwhelming weight of authority is against the holding of the majority opinion.