**LURIA BROTHERS & COMPANY, Inc.**
v.
**The UNITED STATES.**
No. 475–59.

United States Court of Claims.
Dec. 16, 1966.

Thomas H. McGrail, Washington, D. C., attorney of record, for plaintiff. Thompson, McGrail & O'Donnell, Washington, D. C., of counsel.

Russell W. Koskinen, with whom was Acting Asst. Atty. Gen. J. William Doolittle, for defendant.

Before COWEN, Chief Judge, WHITAKER, Senior Judge, and LARAMORE, DURFEE and DAVIS, Judges.

1. Luria Brothers & Company, Inc., as successor in interest to the original plaintiff Lipsett, Inc., has been duly substituted for the latter firm as plaintiff by order

OPINION

WHITAKER, Senior Judge.

This action arises out of a contract between Lipsett, Inc.[1] and the defendant's Bureau of Yards and Docks of the Department of the Navy. The contract, dated January 30, 1953, provided that the plaintiff, in return for $1,480,112 (subsequently increased by change orders to $1,700,166.50), would construct certain aircraft maintenance facilities at the Naval Air Station, Willow Grove, Pennsylvania, by December 31, 1953.

Performance of the contract was substantially completed on May 3, 1955, some 518 calendar days beyond the scheduled completion date. Although the contract contained a clause for the assessment of liquidated damages against the plaintiff for each day of delay beyond the original completion date, none were assessed. Instead, the defendant extended the time of performance of the contract the entire 518 days of the overrun.

On January 30, 1956, the plaintiff submitted to the contracting officer claims totalling $248,665.76 as compensation for certain additional items of work. By letter of April 17, 1956, the defendant advised the plaintiff that the contracting officer had determined that, except for an item relating to engineering expense, its claims were considered to be "in the nature of claims for damages and therefore could not be the subject of compensation under the contract."

On May 11, 1956, the plaintiff appealed the contracting officer's decision to the Secretary of the Navy and at the same time submitted all of its claims, except for the item relating to engineering expense, to the General Accounting Office. The General Accounting Office, by settlement certificate dated December 4, 1956, disallowed plaintiff's claims in their entirety.

dated April 14, 1964. Hereinafter, the word "plaintiff" will be used to refer to Luria Brothers & Company, Inc. and/or Lipsett, Inc.

Subsequently, the Armed Services Board of Contract Appeals, acting for the Secretary of the Navy, ruled that the issuance of the settlement certificate precluded further consideration by the Board of those claims submitted to the General Accounting Office.[2] With respect to the single item of claim not referred to the General Accounting Office, the Board ruled that further proceedings would be in order. However, the plaintiff thereafter withdrew this claim (for engineering expense) from the Board's consideration.[3]

On November 9, 1959, the plaintiff filed a petition in this court asserting that the defendant breached the contract as follows: (a) the original plans were defective and faulty; (b) defendant was dilatory in making necessary contract changes and taking other action; (c) a trial and error method was imposed upon plaintiff by defendant to accomplish certain aspects of the construction and this was contrary to the contract terms and was unreasonable and costly to plaintiff; (d) the magnitude and nature of some of the changes were beyond the scope of the original contract; and (e) the frequency and extensiveness of the revisions to other phases of the construction work were also unreasonable and beyond the scope of the contract. As a result of these breaches, plaintiff contended that its costs of construction were increased and performance of the contract was protracted unduly and into periods of more adverse conditions than would otherwise have occurred.

An extensive trial was held [4] and our trial commissioner issued a report in which he determined that the defendant unreasonably delayed the plaintiff in the performance of the contract work by a total of 420 days out of the 518-day overrun period. He further determined that as a result of these unreasonable delays the plaintiff incurred delay costs for idle equipment, field supervision, winter protection, rehandling materials, maintaining excavations, wage and material price increases, and additional insurance premiums.

As the case comes to us, the parties accept the trial commissioner's report with the following exceptions: The defendant contends that only 300 days (as opposed to the 420 days found by the trial commissioner) were unreasonable delays attributable to the defendant. The plaintiff accepts the trial commissioner's findings on the extent of the delay but contends that he erred in not allowing two items of damage, to wit, for excess home office overhead and loss of productivity of its labor force. For reasons hereinafter set out, we are of opinion that the defendant's exception is without merit and agree with the trial commissioner that the extent of delay was 420 days, but we think that in computing plaintiff's damage the trial commissioner should have allowed plaintiff's claims for excess home office overhead and loss of productivity of its labor force. We thus adopt

2. The Board relied on the Dockery Act, as amended, 31 U.S.C. § 74, and our decision in Brooks-Callaway Co. v. United States, 97 Ct.Cl. 689, 704 (1943), in determining that it no longer had jurisdiction over these claims. Since neither party has raised the issue, we express no opinion on the correctness of this determination by the Board in light of the subsequent Supreme Court decision in United States v. Anthony Grace & Sons, Inc., 384 U.S. 424, 86 S.Ct. 1539, 16 L.Ed.2d 662 (1966).

3. This same engineering expense item, although originally included as part of plaintiff's claim before the court, was also withdrawn from the court's consideration by the plaintiff.

4. At the trial before the commissioner, both parties introduced evidence. The defendant did not object to the introduction of such evidence at any time until proof had been closed and the plaintiff had submitted its proposed findings of fact. Under these circumstances we are of opinion, without deciding whether a trial *de novo* would have been proper had timely objection been made, that any objection that may have been available to the defendant has been waived. See Stein Bros. Mfg. Co. v. United States, 337 F.2d 861, 162 Ct.Cl. 802, (1963), partially overruled on other grounds, United States v. Anthony Grace & Sons, Inc., 384 U.S. 424 n. 5, 86 S.Ct. 1539 (1966).

the trial commissioner's findings and factual conclusions with a few exceptions and additions.

Since the defendant contests the extent of the delay, it will be necessary to state the facts in some detail.

The contract provided that plaintiff was to furnish the materials and perform the work for the construction of a large airplane hangar with an attached leanto. The airplane hangar building was to be 240 feet by 150 feet in dimension and was to have a reinforced concrete arch-type roof with an arch span of 150 feet. The sides of the arch were to rest on concrete columns which in turn were supported by foundation footings placed in the ground. A one-story building, called a leanto, with a partial basement was to be constructed at the north side of the hangar and was to be 240 feet long by 100 feet wide. In addition, the plaintiff was to install various utility systems in and around the building, including a sewer line, a steam line, a water line, a sprinkler system, an electrical system, a telephone system, and a fire alarm system.

Prior to letting the bids for the construction of these facilities, the defendant had contracted with The Ballinger Company, a Philadelphia-based firm of architects and engineers, for the preparation of plans and drawings describing the contract work.[5] It was the plans and drawings prepared by The Ballinger Company upon which plaintiff based its bid and according to which it expected to perform the contract work.

Because of the unusual design of the hangar building, which required the exterior building foundations to carry the entire weight of the structure (principally a concrete roof supported by 9 arches), the 18 foundation footings for the arch columns were of utmost importance. The foundation plan showed 9 arch-column footings along the D-line (south side of the hangar building), running the length of the building at about 30-foot intervals, to be placed at elevation 325 feet or about 8 or 9 feet below the ground surface. The elevations along the E-line (north side of the hangar building) were shown at 320 feet, which was about 11 feet below the surface of the ground. In addition, notes appearing on the plan stated that the arch-column footings were to bear on rock good for a safe load of 15 tons per square foot.

In arriving at the elevations for the arch-column footings which appeared on the foundation plan, The Ballinger Company had relied upon information obtained from some 11 test borings made by the defendant at the construction site.[6] Test bores 2, 5, and 8 were along the D- or south arch-column footing line, and showed either shale or sandstone at elevation 325 feet. Test bores 1, 4, and 7 were along the E- or north arch-column footing line, and showed red sandstone at test bore 1 at elevation 320.71, fractured sandstone at test bore 4 at elevation 320.61, and fractured sandstone at test bore 7 at elevation 317.21. There is no evidence in the record that any tests of the bearing value of the material underlying the arch-column foundation footings were made until after several of the footings had been poured and in place.

On March 4, 1953, the first shipment of reinforcing steel for the building foundations arrived at the site and excavations for foundations of both the leanto and the hangar proceeded. By April 14, 1953, 6 arch-column footings, D–3, D–4, D–5, D–6, D–7, and D–8, for the hangar had been poured.

In each instance approval of the defendant's inspection force had been obtained before concreting.

5. The Ballinger Company subcontracted a portion of the design work to Roberts and Schaefer Company, an architectural firm which had designed a similar hangar for the military in the Denver, Colorado, area.

6. Eight of the test borings were at the location of the hangar building and leanto and three were at the location of a "future" building which was to be on the opposite side of the hangar from the leanto.

On April 15, 1953, up to which time the foundation work had been progressing in an orderly manner, defendant's resident officer in charge of construction began to have grave doubts as to the bearing capacity at the excavations for two of the D-line footings yet to be poured and at the first excavations for the E-line footings. Because of the nature of the material in these excavations, he directed the plaintiff to make bearing tests on the rock at a level 3 feet below the foundation plan elevations for footings E–8 and E–9. In addition, he or the Government inspection force requested that a representative of the architect-engineering firm visit the construction site to inspect the foundation material in the excavations then opened.

Two representatives of The Ballinger Company came to the site on April 17, 1953. Upon inspection of the excavations they found material at the contract depth which in their opinion would not be adequate for the 15-ton bearing value called for on the drawings. They therefore recommended that additional load tests and core borings be made at several of the arch-column footing locations.

As a result of encountering this apparently unsuitable bearing rock, the defendant ordered the plaintiff to stop all pouring of footings on April 17, 1953, and to stop all foundation work on April 24, 1953. Inasmuch as the foundation work was the essential and initial phase of performance, the entire project substantially came to a halt except for work involved in the subsoil investigations directed by the defendant.

From April 23 to May 6, 1953, new subsoil investigations, under the supervision of The Ballinger Company, were conducted by means of core borings and load tests. During these investigations, it was discovered that layers of clay existed at the subgrade elevations where the arch-column and basement footings were designed to rest. Because of this condition, the necessary bearing capacity of 15 tons per square foot did not exist at the contract elevations, and revision of the design of the foundations was considered necessary.

After evaluating the results of the new load tests and core borings and consulting with Roberts and Schaefer Company, its design subcontractor, and with a soil mechanics expert that it had engaged to inspect and consult regarding the subsoil conditions, The Ballinger Company, on May 8, 1953, submitted its report to the defendant on the foundation difficulties. Thereafter, on May 26, 1953, the defendant forwarded to plaintiff a revised foundation drawing, dated May 25, 1953,[7] which directed that the E-line footings were to be lowered to elevation 312 from the originally designed elevation of 320 and that the D-line footings not yet installed were to be lowered to elevations yet to be determined. These revised elevations were subject to the suitability of the rock at the new depth which was to be confirmed by visual inspection. In addition, the drawing directed that for each foot of elevation that a footing was lowered the length of the footing would be increased by one-half foot, and that an appropriate amount of reinforcing steel would be added. It also provided that in the center of the excavations for each of these footings there was to be excavated an additional hole 4 feet by 5 feet by 2½ feet deep for the addition of a key. When the reinforced concrete was placed in the footing excavation, there would then be this block of concrete projecting down an additional 2½ feet. Its purpose was to withstand the horizontal thrust against each of the arch-column footings. With regard to footings D–3 through D–8 which had previously been installed, the revised plan provided that they were to remain in place but in lieu of adding a key, they were to be reinforced by a ring

7. Prior to this, on May 11, 1953, the defendant had forwarded to plaintiff a preliminary revised drawing. However, plaintiff was unable to resume foundation work on the basis of this preliminary drawing because revisions yet to be made, and consequently not appearing on the preliminary drawing, were essential to the resumption of work.

of concrete under and around the center of the footings.

When issued the revised drawing of May 25, 1953, was considered by defendant and its architect-engineers to be the final revised contract drawing. However, on July 20, 1953, the defendant issued a further revision with regard to the arch-column footings.[8] This revision rescinded that portion of the revised plan of May 25, 1953, which had added concrete rings to the previously poured footings D-3 through D-8. The new revision directed that these footings be removed and new footings with keys be installed at elevations varying from 318 to 320 rather than the originally designed elevation of 325.

In early June, after receipt of the May 25, 1953, revised foundation plan, plaintiff resumed work on the foundations. It was not, however, permitted to excavate down to the elevations specified on the revised drawings. Rather, it was directed by the defendant to excavate 1 or 2 feet at a time starting in the existing excavations at elevations 320 and 325, prepare the key excavation, and then level off and trim the excavation into finished form, in order that it could be inspected by defendant's representatives. If the rock appearing was not deemed suitable by the inspectors, another foot or two of excavation was required, the leveling off and trimming again performed, and another inspection made until defendant's inspectors became satisfied that the rock uncovered possessed adequate bearing capacity. This requirement, which indicated that, if satisfactory rock was not found at the designated subgrade elevations, additional excavation would be required, made it necessary for plaintiff to plan the construction of each footing, including the dimension and amount of reinforcing steel and concrete required, on an individual basis as approvals of the excavations were given by defendant's representatives. This trial and error procedure which prolonged significantly the construction of the footings was contrary to good engineering practice and a substantial change in the construction procedure from the original drawings as well as a distortion of the revised design.

As it turned out, none of the arch-column footings were actually poured at the elevations designated on the revised foundation plans. The short of it is that they were ultimately placed at various elevations ranging from 5 to 10 feet lower than originally designed. This was a significant change from the original foundation plans inasmuch as the revised drawings had made the size of each footing dependent upon its elevation and had required the addition of a key thereto. It also precluded almost completely the reuse of footing forms which under the original plans could have been reused since many of the footings were there specified as being the same size and shape.

■ Under these circumstances we are of opinion that the changes made as a result of encountering the unsatisfactory material at the subgrade elevations were of such magnitude that they were not within the scope of the original contract but rather constituted a breach thereof. Saddler v. United States, 287 F.2d 411, 152 Ct.Cl. 557 (1961); Stapleton Constr. Co., Inc. v. United States, 92 Ct.Cl. 551 (1941).

■■ That the original specifications were defective is beyond dispute. They misrepresented the nature of the bearing value of the material underlying the foundation of the structure at the prescribed elevations and hence the dimension and depth at which the arch-column footings were to rest to such an extent that the changes required to complete the structure were beyond the scope of the original contract. It is well-settled that when the Government orders a structure to be built, and in so doing prepares the specifications prescribing the character, dimension and location of the construction

---

8. A revision had also been issued on July 15, 1953, by which elevations for some of the footings for the leanto columns were lowered and the slope between these footings and the adjacent E-line footings was limited.

708

work, it implicitly warrants that if the specifications are complied with, satisfactory performance will result. United States v. Spearin, 248 U.S. 132, 39 S.Ct. 59, 63 L.Ed. 166 (1918); Laburnum Constr. Corp. v. United States, 325 F.2d 451, 163 Ct.Cl. 339 (1963). When, as here, defective specifications delay completion of the contract, the contractor is entitled to recover damages for defendant's breach of this implied warranty. Laburnum Constr. Corp. v. United States, supra; Warren Bros. Roads Co. v. United States, 105 F.Supp. 826, 123 Ct.Cl. 48 (1952); Stapleton Constr. Co., Inc. v. United States, supra.

In addition, the defendant was dilatory both in recognizing the need for and in making appropriate revisions to the defective foundation plans. Defendant should have determined whether the subgrade rock had adequate bearing capacity prior to approving the pouring of the first D-line footings. Upon finally recognizing that the subgrade rock was unsatisfactory, defendant or its agents should have completed the redesign of the foundation with all due haste so that plaintiff could have continued the foundation work without any significant delay.

■■ Furthermore, the defendant should not have imposed upon the plaintiff the unreasonable trial and error method of excavation once the revised design had been completed. This requirement, together with the extremely slow recognition and correction of the defective plans, constituted a breach of the implied obligation contained in every contract that neither party will do anything that will hinder or delay the other party in performance of the contract. Cf. Chalender v. United States, 119 F.Supp. 186, 127 Ct.Cl. 557 (1954); J. A. Ross & Co. v. United States, 115 F.Supp. 187, 126 Ct.Cl. 323 (1953); George A. Fuller Co. v. United States, 69 F.Supp. 409, 108 Ct.Cl. 70 (1947).

■■ That these breaches of contract by defendant caused considerable delay in connection with the foundation work is clear from the foregoing. Plaintiff is of course entitled to recover the damages which it incurred because of this delay.

Upon consideration of the evidence, our trial commissioner has determined that the defendant unreasonably delayed the progress of the foundation work for a period of 330 days of the total of 420 days' delay. This finding is fully supported by the record.

The defendant has taken exception to this finding on two grounds. First, it contends that the 330 days of unreasonable foundation delay, which the trial commissioner has charged to it, should be reduced by 90 days because the plaintiff agreed in change order "L," which granted a time extension of 304 days, that 129 days were attributable to strikes. Ninety of these 129 days, according to defendant, have been included by the trial commissioner in the 330 days of unreasonable delay which he attributed to the defendant in connection with the foundation work.

■■ The only evidence in the record of strikes which occurred during the period of time that plaintiff was engaged in foundation work concerns a general carpenters' strike from April 14 until June 17, 1953, except for 6 days between April 22 and April 30 and a reinforcing steel workers' strike from April 19, 1953 to July 6, 1953. The trial commissioner has found, and he is fully supported by the evidence, that neither of these strikes resulted in any delay of the foundation work inasmuch as plaintiff had no need for carpenters or reinforcing steel workers during these periods because of the suspension of work on the contract by the defendant due to the difficulties then being encountered with the elevation and design of the arch-column footings. Defendant does not seem to dispute the trial commissioner's factual finding that the strikes did not actually delay the foundation work but says plaintiff agreed they did by its acceptance of change order "L." Plaintiff is not bound by the terms of this change order. It consisted of a letter from the contracting officer extending the time for the performance of

the contract for 304 days. (The total of all change orders issued extended the time 518 days.) The contracting officer did say that 129 days of the 304 days was due to strikes, but the plaintiff is not bound by that. It was interested only in the extension of time, so that it would not be assessed liquidated damages, and not in the reasons assigned by the contracting officer for granting the extension. It has long been the rule in this court that in a case such as this, the cause or extent of delay determined by a contracting officer in a grant of additional time is not final and conclusive nor entitled to overwhelming weight. Robert E. Lee & Co., Inc. v. United States, 164 Ct.Cl. 365, 368 (1964), and cases there cited.

Second, defendant contends that the trial commissioner's allocation of 330 days to unreasonable foundation work delay should be further reduced by 30 days which, according to defendant, should have been allowed as a reasonable length of time to make the necessary design changes once it was determined that the original elevations for the arch-column footings were not acceptable.

■ Ordinarily, defendant is entitled to make necessary changes, but where the change is necessitated by defective plans and specifications defendant must pay the entire resulting damage without any deduction for time to make changes, as would be the case if the redesign were necessitated by a changed condition or the like. See Laburnum Constr. Corp. v. United States, supra.

Based on the foregoing, we are of opinion that the defendant was responsible for 330 days of unreasonable delay in connection with the foundation work.

In addition to the 330 days of unreasonable delay in connection with the foundation work, the trial commissioner also found that the defendant unreasonably delayed plaintiff 90 days in connection with other aspects of the construction work. About these 90 days there is no dispute so we do not state the facts as to them. It is sufficient to say that, as with the foundation delays, they resulted from defendant's breaches of contract, and plaintiff is entitled to recover any damages that it suffered as a result thereof.

In summary, we reach the conclusion that the defendant unreasonably delayed the plaintiff in the performance of the contract work by a total of 420 days out of the 518-day overrun period.

■ The trial commissioner has determined that the plaintiff suffered delay damages and additional expenditures directly attributable to the defendant's breaches in the amount of $85,544.92. This amount is made up of 81 percent $\left(\frac{420}{518}\right)$ of the overrun period costs for idle equipment, field supervision, winter protection, rehandling materials, maintaining excavations, and wage and material price increases plus 100 percent of an insurance premium plaintiff was required to pay. (See infra findings 46–54, 57.) This fairly represents the damages suffered by plaintiff with regard to those items.

We come now to consider two elements of damage not allowed by the trial commissioner, to wit, home office overhead and loss of productivity of labor.

*Home office overhead.* In finding 6, the trial commissioner finds that on June 28, 1957, in response to a request of the officer in charge of construction, plaintiff executed a release releasing the Government from all claims against it with certain exceptions. Then in finding 49 (b) of his report, the trial commissioner says that he is making no finding with reference to home office overhead as an item of damage, since the exception in the release "relates only to overhead 'in the field.' The language of the release clearly waives any claim for any overhead not 'in the field' which can only mean the job site. * * *"

■ We are of opinion that the trial commissioner was in error in finding that plaintiff was not entitled to home office overhead and hence in failing to determine the amount thereof. Home office overhead is a well-recognized item of

damage for delay and plaintiff would be entitled to recover it, if it did not release its claim to it. J. D. Hedin Constr. Co. v. United States, 347 F.2d 235, 171 Ct.Cl. 70 (1965); F. H. McGraw & Co. v. United States, 130 F.Supp. 394, 131 Ct. Cl. 501 (1955); Fred R. Comb Co. v. United States, 103 Ct.Cl. 174 (1945).

■ The defendant in its answer did not set up the release as a defense to plaintiff's claim, as it is required to do under Rule 19(b), nor was any mention made of it in the trial of the case, nor did defendant ask the trial commissioner to make any finding with respect to it. Hence, under Rule 20(h) this defense is waived.

But, even if defendant had properly pled the release as a defense, we do not think it waived plaintiff's claim to home office overhead.

The release was executed in response to the letter of the officer in charge of construction dated June 20, 1957, in which he stated that there was an outstanding balance in plaintiff's favor of $100, for which he requested plaintiff to submit an invoice and a release, so that his books could be closed; but in his letter he stated: "Payment of this outstanding balance and execution of these releases qualified does not in any manner prejudice your pending claims. The releases may be qualified to indicate the extent to which the release is given."

The release executed by plaintiff, dated 8 days later, contained the following exception:

* * * except that it is specifically understood and agreed that nothing contained herein shall release, remise or discharge, the government, its officers, agents and employees from, nor in any way prejudice contractor's right to, payment in any amount arising out of any transactions with respect to which claims or requests for payment dated May 11, 1956 were directed to the United States General Accounting Office and the Secretary of the Navy, nor shall anything contained herein prevent or bar contractor from pursuing any and all remedies to collect sums in any amount arising out of such claims and requests for payment. * *

The release recited that it was not intended to "prejudice contractor's right to payment *in any amount arising out of any transactions* with respect to which claims or requests for payment dated May 11, 1956" had been made. [Emphasis supplied.] It will be observed that the exception to the release is couched in terms of no narrow scope. It excepts "any amount arising out of any transactions with respect to which" claim was made in the named letter. It is unlimited as to the amount of any claim so long as the claim was specified in the letter. If it arose "out of job operating expense in the field" (upon which the trial commissioner apparently relies), it is excepted from the release. Home office overhead, of course, arose out of "job operation in the field," and, hence, is excepted from the release.

■ Faced with language so sweeping, defendant was fully justified in not pleading the release as a defense to plaintiff's claim, and the trial commissioner was in error in holding it waived overhead.

■ This brings us to the task of determining the amount of plaintiff's home office overhead. Prior to trial, the defendant, through its Federal Bureau of Investigation (FBI), audited plaintiff's books and records, and based thereon stated its differences with the amount of damages plaintiff had alleged its books and records reflected. Thereafter, the plaintiff stipulated that it accepted the FBI audit as accurate. The FBI audit shows that the total home office overhead for the 818 days of the contract (300-day original contract period plus 518-day overrun) allocable to the Willow Grove job was $171,228.68.[9] We have held that

9. Home office overhead was allocated to the Willow Grove job based on its percent of total volume of business of the plaintiff. The percentage allocations for Willow Grove for the years 1953, 1954, and 1955 were respectively 13%, 11.7%, and 1.3%.

a contractor can recover as damages the amount of overhead on a daily basis allocable to the period of overrun for which the Government is responsible. See, e. g., J. D. Hedin Constr. Co., Inc. v. United States, supra, 347 F.2d at 259, 171 Ct.Cl. at 108. The prorated amount of the full overhead of $171,228.68 allocated to the 518-day overrun is $108,430.87. From this figure must be deducted $11,350 which plaintiff had previously received for home office overhead by change orders, and $19,366.88 which is a duplication of costs included in another item of its claim.[10] This results in a net amount of $77,713.99 of additional home office overhead attributable to the 518-day overrun period.[11] Since the defendant was responsible for 420 days of the 518-day overrun period, the plaintiff is entitled to recover as damage 81 percent $\left(\frac{420}{518}\right)$ of the additional home office overhead attributable to that period, or $62,948.33.[12]

*Loss of Productivity.* The second item of damage, not allowed by the trial commissioner, claimed by plaintiff to have been caused by defendant's delay was loss of productivity of its labor force. First, it says the delay required it to work during severe winter weather between December 1, 1953 and March 10, 1954, and again between November 25, 1954 and January 19, 1955; second, from March 11 to August 11, 1954, it had to work under adverse water conditions; and, third, the constant revisions in the contract drawings resulted in confusion and interruption of the orderly progress of the work.

For this loss of productivity of its labor, it claims damages in the aggregate amount of $131,116.66. In its proposed findings of fact plaintiff asked the trial commissioner to make findings accordingly, but the trial commissioner did not do so because, we suppose, he was of opinion that the release signed by plaintiff embraced this claim. As we have heretofore stated, we disagree with the trial commissioner and are of opinion that plaintiff is not foreclosed from relying upon this claim.

10. The FBI audit shows that $19,366.88 of plaintiff's claim for home office overhead was included in its claim item 3 (field supervision after December 1, 1953). The FBI auditors apparently determined that this amount was more properly includable in claim item 3 than in the claim for home office overhead.

11. A mathematical calculation of the foregoing is as follows:

$$\left(\frac{518}{818}\right) \times 171,228.68) - 11,350 - 19,366.88 = 77,713.99.$$

———◆———

12. The FBI audit also reflects a different method for calculating the additional home office overhead attributable to the 518-day overrun period. This method of calculation starts with the use of total home office overhead of $171,228.68 for the 818-day period of the contract work just as the method described above in the text. From this total figure, however, there is deducted $74,006, an amount equal to 5% of the original contract price. This 5% figure is apparently an estimate of what home office overhead would have or should have been had the contract been completed within the original 300-day contract period. Carrying out this calculation, the audit reaches a gross figure of $97,222.68 for additional home office overhead attributable to the 518-day overrun period. From this there are deducted $11,350 and $19,366.88, representing respectively the amounts previously received by change orders and costs duplicated in other claim items resulting in a net excess home office overhead amount of $66,505.80.

We reject the use of this method of calculation in the instant case since it is based upon the use of an additional estimate (the 5% figure) in determining the excess overhead. We are of opinion that the method described in the text more accurately reflects the additional home office overhead incurred by the plaintiff during the 518-day overrun period.

Except for the fact that there has already been a shockingly long period of time since plaintiff first presented its claim to the contracting officer and the date the case reached us for decision, we would remand the case to the trial commissioner for findings on both this claim and home office overhead, but, under the circumstances, we feel compelled to make findings ourselves on these two items.

The testimony on loss of productivity is far from satisfactory. Plaintiff's sole witness on this point was John Crawford, who had been in plaintiff's employ for about 10 years and who was its chief of construction at the time the work on this job was being done. However, at the time of his testimony he had left plaintiff's employ and was then chief engineer in the New York area for the Frouge Corporation of New York City and Bridgeport, Connecticut, a company with which plaintiff had no connection. It was a large company, with $50 million worth of building construction in that area, consisting of housing developments, apartments, and office buildings. Mr. Crawford had graduated as a civil engineer from Columbia University in 1924, since which time he had been engaged in both heavy and building construction work.

He was a competent witness, well-qualified to express an opinion on the loss of productivity of the labor. But, strangely, plaintiff offered no corroboration of his testimony. But, stranger still, defendant did not cross-examine him on this point and offered no testimony in rebuttal. His testimony stands unchallenged.

The defendant's sole reply to plaintiff's request that the trial commissioner find the facts as testified to by this witness was in its exceptions to plaintiff's proposed findings of fact. In this document, defendant made only this reply:

Plaintiff's productivity losses, so-called, were based on estimates, entirely unverifiable.

Defendant considered this item unproved. It entirely neglects allowances for time consumed by strikes, plaintiff's own delays, and other non-government delays.

 That loss of productivity of labor resulting from improper delays caused by defendant is an item of damage for which plaintiff is entitled to recover admits of no doubt, Abbett Electric Corp. v. United States, 162 F.Supp. 772, 142 Ct.Cl. 609 (1958); nor does the impossibility of proving the amount with exactitude bar recovery for the item. Needles v. United States, 101 Ct.Cl. 535, 618 (1944); cf. Anderson v. Mt. Clemens Pottery Co., 328 U.S. 680, 688, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946), and cases there cited.

In Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 561, 51 S.Ct. 248, 75 L.Ed. 544 (1931), cited in Anderson v. Mt. Clemens Pottery Co., supra, the trial court had instructed the jury to determine as an element of damage:

\* \* \* (1) the difference, if any, between the amounts actually realized by petitioner and what would have been realized by it from sales at reasonable prices except for the unlawful acts of the respondent; \* \* \*.

The Court of Appeals, 1 Cir., 37 F.2d 537, was of the opinion that no recovery could be had on this item because

\* \* \* there was no basis for a reasonable inference that prices in excess of those actually realized would have prevailed if there had been no combination; and that in any event, there was no damage which could be measured and expressed in figures not based on speculation and conjecture. Ibid.

With respect to this holding, the Supreme Court said, 282 U.S. at 562–63, 51 S.Ct. at 250–251:

It is true that there was uncertainty as to the extent of the damage, but there was none as to the fact of damage; and there is a clear distinction between the measure of proof necessary to establish the fact that petitioner had sustained some damage and the measure of proof necessary to enable

713

the jury to fix the amount. The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount. * * *

* * * * * *

Where the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts. In such case, while the damages may not be determined by mere speculation or guess, it will be enough if the evidence show the extent of the damages as a matter of just and reasonable inference, although the result be only approximate. The wrongdoer is not entitled to complain that they cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise. * * *

■ It is a rare case where loss of productivity can be proven by books and records; almost always it has to be proven by the opinions of expert witnesses. However, the mere expression of an estimate as to the amount of productivity loss by an expert witness with nothing to support it will not establish the fundamental fact of resultant injury nor provide a sufficient basis for making a reasonably correct approximation of damages. See Wunderlich Contracting Co. v. United States, 351 F.2d 956, 968, 173 Ct.Cl. 180, 199 (1965).

Crawford's testimony is unrebutted. Defendant, out of whose pocket the money must come to pay the large sum testified to by him, did not undertake to discredit his testimony, and so, while it is the sacred duty of this court to protect the Government from unrighteous demands as well as to protect the citizen from imposition by the Government, we cannot wholly reject this witness's testimony on the question of amount of damage.

However, we cannot ignore the fact that he was plaintiff's former employee and had been over a period of 10 years. While he was not in plaintiff's employment at the time he testified, he quite properly had a certain predilection for his old employer and wanted to "help them out" all he could. His sympathy was naturally with his former employer rather than with the Government. We do not mean the witness was dishonest, but we do think he made his estimates as high as he could to the extent his conscience would permit.

Crawford testified that between December 1, 1953, and March 10, 1954, the productivity of plaintiff's labor force was reduced inasmuch as the men had to work outside on trench excavations and foundation construction in winter weather. This required them to wear gloves and warmer clothing, and to work on ground which was frozen and/or extremely wet because of the rising ground water during that time of year. Based on his overall experience in construction work and his observation of this particular job, he estimated that the average loss of productivity of labor during this period was 33⅓ percent. With regard to the period between March 11, 1954, and August 11, 1954, Crawford testified that the labor productivity was reduced 25 percent because of adverse water conditions encountered at the construction site. During the period from August 12, 1954, to November 24, 1954, Crawford estimated that the average loss of productivity of plaintiff's labor force was 20 percent because of confusion and interruption of normal job progress as a result of several revisions by defendant of the contract drawings for the leanto building. Crawford also estimated that the loss during the period from November 25, 1954, to January 19, 1955, was 20 percent due to cold weather conditions when the men had to work in an only partially completed structure.

■ That winter weather and adverse water conditions reduce the effi-

**714**

ciency of a labor force in the performance of construction work only stands to reason. It has been held by this court that when loss of productivity brought about by these conditions results from defendant's breach of contract, the plaintiff is entitled to recover its additional costs occasioned thereby as damages. F. H. McGraw & Co. v. United States, 82 F. Supp. 338, 113 Ct.Cl. 29 (1949); Abbett Electric Corp. v. United States, supra. However, with respect to the loss of efficiency caused by the revisions to the leanto plans during the period from August 12, 1954, to November 24, 1954, there is no testimony that there was a loss of efficiency on this account other than Crawford's estimate of the amount thereof. Proof of damage is essential before estimates can be received of the amount thereof. Plaintiff's claim for loss of productivity during that period must therefore be rejected. See Wunderlich Contracting Co. v. United States, supra, 351 F.2d at 968, 173 Ct.Cl. at 199.

 Notwithstanding the fact that Crawford's estimates regarding the other three periods are unrebutted, we cannot ignore the fact that the percentages testified to were merely estimates based upon his observation and experience. Furthermore, his estimates are much higher than those testified to in other cases in which the conditions were not materially different from those present here. Taking these things into consideration and in view of the fact that no comparative data, no standards, and no corroboration support his testimony, we are constrained to reduce his estimates based on the record as a whole and the court's knowledge and experience in such cases to 20 percent, or $11,091.02 for the period from December 1, 1953, to March 10, 1954; to 10 percent, or $13,014.87 for the period from March 11 to August 11, 1954; and to 10 percent, or $925.50 for the period from November 25, 1954, to January 19, 1955.

The total additional cost to plaintiff during the 518-day overrun period because of loss of productivity of its labor force was thus $25,031.39. (See infra

finding 56.) Because of a duplication of costs included in another of plaintiff's claims, $4,550.63 must be deducted from this total figure. This results in a net cost to plaintiff of $20,480.76 because of loss of productivity of its labor force. Since the defendant was responsible for 420 days of the 518-day overrun, plaintiff is entitled to recover 81 percent of this amount, or $16,589.42.

We have found that the plaintiff is entitled to recover $62,948.33 for excess home office overhead. Adding these two items to the $85,544.92 found by the trial commissioner makes a total of $165,082.-67. A judgment for this amount is entered in favor of plaintiff against defendant.